**Opinion issued March 20, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-23-00204-CR**

———————————

**JORDY H. SULJANOVIC, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 177th District Court**
**Harris County, Texas**
**Trial Court Case No. 1618302**

---

**MEMORANDUM OPINION**

Jordy H. Suljanovic appeals from his conviction for the offense of capital murder and automatic sentence of life imprisonment without parole. *See* TEX. PENAL CODE §§ 19.03(a)(7)(A), (b), 12.31(a)(2). The jury determined that he shot and killed his wife and her boyfriend after finding them together in the family home.

In seven issues on appeal, Suljanovic argues that: (1) the evidence was legally insufficient to support his conviction for capital murder because the evidence did not establish that he intentionally or knowingly caused his wife's death; (2) the trial court erred by admitting a police officer's testimony about the truthfulness of another person; (3) the trial court erred by admitting Suljanovic's testimony about his prior extramarital affair; (4) the trial court erred by denying his motion for mistrial after the prosecutor made a remark that Suljanovic contends was inflammatory; (5) the trial court erred by admitting testimony that he physically and verbally abused his daughter; (6) the trial court erred by admitting victim-impact evidence during the guilt-innocence phase of trial; and (7) the cumulative errors caused cumulative harm. We affirm.

**Background**

Suljanovic and his wife, Adrianna Perez, had four children: Leasly, who was eighteen years old when Adrianna died; Jordy Jr., who was then seventeen years old; and two young girls under the age of ten.[1] All four children lived with Suljanovic and Adrianna in Houston.[2] Suljanovic and Adrianna shared the primary bedroom in the family home, and this bedroom had an adjoining bathroom and closet.

---

[1]     Suljanovic and Adrianna had a fifth child who died in infancy.

[2]     Several people relevant to this opinion share the same last name. For ease of reading, this opinion adopts the parties' practice of referring to everyone except the appellant, law enforcement officers, and expert witnesses by their first names.

As Suljanovic acknowledges on appeal, his and Adrianna's "marriage was not a happy one." Suljanovic was born in Bosnia, and Adrianna was born in Mexico. They met during high school and communicated primarily through broken English. Leasly and her uncle, Guillermo Renteria, testified that Suljanovic had a temper, and he physically and verbally abused Adrianna. Guillermo and a family friend testified that they had seen bruises on Adrianna's body.

During a family vacation a few months before Adrianna's death, Suljanovic and Adrianna were in a bedroom when his gun fired. Adrianna ran out of the room shouting that he "almost killed" her, although Suljanovic insisted that the gun had discharged accidentally. A month later, Leasly called Guillermo crying and asked him to come to her house because Suljanovic had beaten up her and Adrianna. Suljanovic left the house before Guillermo arrived, and the family called the police to report the incident. Guillermo testified that Suljanovic liked Jordy Jr. more than Leasly and treated him more favorably. Leasly testified that her parents' relationship was "pretty horrible" and "pretty abusive," and Suljanovic physically and verbally abused both her and Adrianna.

At the time of her death, Adrianna was having an extramarital affair with Omar Nahum Santamaria-Ruiz. Suljanovic suspected that Adrianna was having an affair, and he spied on her. He once got her intoxicated and recorded Jordy Jr. and Leasly asking her questions in Spanish about the number of men she had slept with.

3

A witness testified that in September 2018, one month before Adrianna's death, Suljanovic was intoxicated in a bar and repeatedly stated that Adrianna was out with her boyfriend, "if [he] catch[es] them [he] would kill them," and he "could get rid of them and they would never find them." The witness testified that Jordy Jr. had to help remove Suljanovic from the bar, and Suljanovic repeatedly told Jordy Jr. that "he was going to kill [Jordy Jr.'s] fucking mom."

A few weeks before Adrianna's death, Suljanovic bought a hidden video camera disguised as an internet router and put it in his and Adrianna's bedroom. He was able to view a live stream of the video camera on his cell phone, but the camera did not store any recorded video.

Suljanovic was employed as a truck driver. Shortly after midnight on October 2, 2018,[3] Suljanovic was hauling a load in his tractor-trailer from Houston, Texas, to Gonzalez, Louisiana. Driving eastbound on I-10, he viewed the live stream of the video camera in his bedroom more than twenty times. Just after 3:00 a.m. as he drove through Sulphur, Louisiana, about halfway to his destination and about 140 miles from home, he pulled his truck to the side of the road. He testified that the camera angle had changed and that he saw Adrianna walking around naked in their bedroom when she was supposed to be sleeping, which further raised his suspicion that she

---

[3] A law enforcement officer searched various cell phones belonging to Suljanovic and his children. The officer testified to the timeline presented here.

was cheating on him back home. He turned off the GPS tracker in his truck, turned around, and drove home.

Suljanovic arrived home just before 6:00 a.m. He usually carried a firearm with him, and he placed it in his waist holster and went inside. He went into his bedroom and when he exited a few minutes later, both Adrianna and Omar were lying dead on the floor of the bedroom closet. Suljanovic, Adrianna, and Omar were the only people present in the bedroom at the time. The events leading up to their killing were disputed at trial.

Leasly testified that she was asleep on the couch when Suljanovic came home, and she was awoken by three "rapid fire" gunshots. When Suljanovic exited the bedroom, he told Leasly that he had "shot" or "killed those bastards." He led Leasly into the bedroom, and she saw two bodies on the closet floor. She wanted to call 911, but Suljanovic told her not to because "there was no saving her, he shot her in the head." Leasly then went into her sisters' bedroom to check on the two young girls.

Suljanovic testified in his own defense. According to his testimony, Leasly was awake on the couch playing on her cell phone when he got home.[4] He spoke

---

[4]     A law enforcement officer testified that he searched Leasly's cell phone and determined that there was no outgoing activity on the phone between midnight and 6:48 a.m., which was consistent with her being asleep and not on her phone during this time.

briefly to her and then walked into his bedroom. He did not see Adrianna, but he saw a man lying on the floor. The man ran past him and exited through a window in the bedroom.[5] Suljanovic then walked into the bathroom where he found a naked man standing. He later learned that this man was Omar.

According to Suljanovic, Omar angrily said some words in Spanish as he advanced toward Suljanovic. Suljanovic pulled his firearm out of his holster, but Omar attacked him causing Suljanovic to drop the firearm. Omar was able to get the firearm and fire three rounds into the ground. Suljanovic pushed Omar, who fell into the closet and dropped the firearm. Omar jumped up and advanced towards Suljanovic again. Suljanovic grabbed the gun and fired a warning shot, but Omar continued advancing, so Suljanovic fired a second warning shot that hit Omar in the leg. The wound did not stop Omar, so Suljanovic shot him in the chest or stomach area, and Omar fell to the ground.

Suljanovic then went into the closet looking for Adrianna. He found her dead on the floor with a gunshot wound to her head. He denied that he killed her and testified that Omar accidentally shot her. Suljanovic turned around and shot Omar several times as he lay on the ground. Suljanovic denied that he told Leasly he had shot or killed those "bastards." He testified that he said "bastard" referring to Omar.

---

[5]     The record on appeal contains no additional information about this man.

He also testified that he wanted to call 911, but Leasly told him not to because he could go to jail.

The events after Adrianna's and Omar's deaths were largely undisputed. Jordy Jr. helped Suljanovic carry the two bodies and load them into the trunk of Leasly's car. Within an hour of his arrival home, Suljanovic and his children left the house and drove to Gonzalez, Louisiana, to deliver the load Suljanovic was hauling before his return to Houston. Suljanovic drove his tractor-trailer, and the two young girls rode with him. Jordy Jr. drove Leasly's car with the bodies in the trunk and followed Suljanovic. Leasly rode in the passenger seat of her car. When Suljanovic reached Sulphur, he turned on the truck's GPS near where he had turned it off previously. After delivering the load in Gonzalez, Suljanovic and his children drove to a truck stop in Louisiana. Suljanovic parked the truck and left Leasly and the two young girls in it.

Meanwhile, Suljanovic and Jordy Jr. drove in Leasly's car to Livingston, Texas, and then back across the border into Louisiana. A Louisiana sheriff's deputy stopped them for a traffic violation while the bodies were in the trunk. The deputy spoke to Suljanovic and obtained his consent to search the car, but the deputy ultimately decided not to search the car because he did not believe that it contained narcotics. Suljanovic and Jordy Jr. then drove down a rural road in Louisiana where they dumped Omar's body in some woods near the side of the road. Suljanovic

7

decided to return home with Adrianna's body, so he and Jordy Jr. returned to the truck stop where Leasly and the young girls had been waiting for more than eighteen hours.

Suljanovic and the children left the truck stop to drive home. As before, Suljanovic drove the tractor-trailer with the two young girls in it. Jordy Jr. followed in Leasly's car, Leasly sat in the passenger seat, and their mother's body remained in the trunk. Before reaching Texas, Jordy Jr. exited the highway and drove down another rural road where he dumped his mother's body in some trees near the side of the road. Jordy Jr. then caught up with Suljanovic on the highway. They returned home around 1:00 p.m. on October 3, the day after the deaths of Adrianna and Omar. Suljanovic conceded that he cleaned up blood in the trunk of the car.

On October 2, when Omar did not show up for work or return home, his family filed a missing person report with the Houston Police Department (HPD). On October 3 after Suljanovic returned home, some of Omar's family members went to Suljanovic's house looking for Omar. The family members knew that Omar and Adrianna were in a romantic relationship, and they believed that Adrianna had filed for divorce. Suljanovic told Omar's family that Adrianna had left and would not return for several months.

Also on October 3, Suljanovic, Jordy Jr., and Leasly went to a police station and filed a missing person report concerning Adrianna.[6] The case was assigned to Detective Elena Claburn. She linked the report of Adrianna's disappearance with the report of Omar's disappearance because Omar's family reported that Omar was in a relationship with Adrianna and was last seen with her.

Shortly after returning from Louisiana, Suljanovic and his children spent a night at Guillermo's house. Suljanovic told Guillermo that Adrianna had run away and was missing, but Guillermo did not believe him. Guillermo testified that Suljanovic denied doing anything to her and that he said "it doesn't matter. Me and her, we don't matter" and "we don't count here." Suljanovic also said that "[s]he's dead or I'm dead, too." Suljanovic also told Guillermo that he was going to look for Adrianna in Mexico, but Guillermo did not believe that Adrianna had gone to Mexico because she would not be able to reenter the United States if she had done so. Guillermo left for work the next morning and did not see Suljanovic again until trial.

On October 8, Suljanovic signed a contract for the sale of the family home. The sale closed on October 15.

---

[6] Leasly testified that Suljanovic told her what to say when reporting her mother missing.

9

Detective Claburn went to Suljanovic's home on October 12 to follow up on the missing person reports. Suljanovic told Claburn that Adrianna had broken into his safe and stolen $20,000 and a gun. Suljanovic also reported, however, that Adrianna had access to a key to the safe. He initially reported that he left for Louisiana at 1:30 a.m. on October 2, drove straight to Gonzalez, and arrived there at noon. But then he said that he had stopped to change a headlight in Sulphur before reaching Gonzalez.

On October 19, Claburn learned that Suljanovic was planning to leave the country. She contacted him and asked him to meet with her on October 22. Suljanovic agreed, but he did not show up for the meeting. Claburn attempted to contact Suljanovic, but she was unable to reach him. Based on this information, Claburn then transferred both missing person cases to HPD's homicide division for further investigation.

Suljanovic drove to Mexico in Leasly's car on October 19. He took his two young daughters, Jordy Jr., and Jordy Jr.'s sixteen-year-old girlfriend.[7] They stayed at a motel in Nuevo Laredo before traveling to Mexico City. On October 24, Suljanovic went to the Mexico City airport and bought plane tickets to Croatia—the airport nearest to his hometown in Bosnia—with a layover in London. He bought tickets for himself and the children.

---

[7]     Leasly did not travel to Mexico with the rest of her family.

HPD Homicide Detective Eric May interviewed Leasly and Guillermo on October 22. May learned that Suljanovic had left for Mexico, so he asked Leasly and Guillermo to drive to Mexico to help locate him. May also enlisted the assistance of the Federal Bureau of Investigation (FBI).

While Leasly and Guillermo drove towards Mexico on October 24, the FBI learned that Suljanovic and the children had boarded the plane to Croatia. Agents called Guillermo and relayed this news to him. They also informed him that Adrianna was dead and that he and Leasly should return home.

May was concerned that if Suljanovic made it to Croatia, "he was never going to come back." So May obtained an arrest warrant for Suljanovic and filed it with various federal agencies.[8] When Suljanovic arrived in London for the layover, police escorted him and the children off the airplane and detained them. The children were returned to Houston. Suljanovic was sent to New York City, where he was detained in a Manhattan jail for five months before he was extradited back to Houston.[9]

The FBI found Adrianna's body in a wooded area near a rural road in Louisiana on October 28. The same day, police obtained a warrant to search the

---

[8]    Police also obtained an arrest warrant for Jordy Jr. for tampering with evidence, specifically a human corpse.

[9]    A Law Enforcement Activity Executive for British Airways, the airline that transported Suljanovic from Mexico City to London, testified that Suljanovic was detained separately from the children because border patrol prohibited his entry into the country.

Suljanovic family home. During the search, law enforcement officers found the house in "complete disarray" with "[f]loors partially ripped up" and all the furniture removed.[10] Officers found bare concrete floors in Suljanovic's bedroom and closet, and Leasly testified that green carpeting had been in the closet at the time of her mother's death. Agents also found fresh patches in the drywall near where the deaths had occurred. Agents removed some of the drywall and searched for bullets, but they were unable to find any. An agent testified that she found a half-empty bottle of bleach in the bedroom, which she believed had been used to clean up the area after the deaths. Suljanovic conceded that he had cleaned up the blood in the house. But agents found no obvious evidence of the shootings.

A separate FBI team travelled to Mexico City to search Leasly's car, which had been towed from the airport to the United States embassy. Agents searched the car and found cell phones, but they were unable to find any blood or hair evidence related to Adrianna's and Omar's deaths.[11]

Agents found Omar's body on December 24. Dr. Genesse Listi, a forensic anthropologist at Louisiana State University, analyzed both Omar's and Adrianna's bodies and determined their identities. Dr. Listi also determined that Adrianna and

---

[10]   A later search of Suljanovic's tractor-trailer revealed that the home's furniture was stored in a trailer leased by Suljanovic.

[11]   The parties stipulated that FBI agents found a rag that tested positive for a blood stain, but no DNA results could be obtained from the sample.

Omar were each shot once in the head in similar locations. She also found a fragment of a bullet in Adrianna's vertebrae, and she testified that this could not have been the same bullet that caused Adrianna's head wound. Because Omar's body was found later than Adrianna's body, some of Omar's bones were not recovered.[12] Suljanovic claimed that he had shot Omar in the leg as a warning, but FBI agents were unable to locate Omar's leg bone.

Suljanovic was indicted for capital murder on January 16, 2019. During a six-day trial, the State called eighteen witnesses, including family and friends of Adrianna and Omar and numerous law enforcement officers from various agencies, including HPD, the FBI, the Sabine Parish Sheriff's Office in Louisiana, and the New York Police Department. Jordy Jr. did not testify, and his prior statements were not admitted into evidence, but the trial court permitted Detective May to testify whether he believed Jordy Jr. was truthful in his statements to police. The trial court also permitted Leasly and Guillermo to testify that Suljanovic verbally and physically abused both Adrianna and Leasly. The trial court further allowed Leasly to testify that after her mother's death, she resigned from the United States Navy because her superiors' conduct reminded her of her father's conduct towards her and that she later sought therapy. The trial court also allowed the State to ask Suljanovic about his own extramarital affair.

---

[12]    Dr. Listi testified that animals likely scavenged the bones.

13

While cross examining Suljanovic, the State asked whether Jordy Jr. and Leasly "wanted to get involved in the commission of a crime by driving bodies across [a] state line[.]" When Suljanovic responded "Yes," the State commented, "And you're father of the year; said, That sounds like a great idea." The trial court sustained Suljanovic's objection on the ground of improper sidebar remark. At defense counsel's request, the trial court instructed the jury to "disregard the last statement made by the State," but the court denied Suljanovic's motion for mistrial.

During closing arguments, the State argued that Suljanovic had entered his bedroom in the early hours of October 2, found Adrianna and Omar asleep in the closet—out of view of the video camera in the bedroom—and shot them both in the head. The jury found Suljanovic guilty of capital murder, and the trial court sentenced him to automatic life imprisonment without parole. This appeal followed.

## Legal Sufficiency of Evidence

In his first issue, Suljanovic argues that the evidence was legally insufficient to support his conviction for capital murder.

### A. Standard of Review

In a criminal trial, the State has the burden to persuade the factfinder that the defendant is guilty of the charged offense beyond a reasonable doubt. *Baltimore v. State*, 689 S.W.3d 331, 340 (Tex. Crim. App. 2024). Evidence is legally sufficient to support a conviction if a rational trier of fact could have found that the defendant

committed each element of the charged offense beyond a reasonable doubt. *Id.* Circumstantial evidence is as probative as direct evidence and can suffice alone to establish guilt. *Williams v. State*, 606 S.W.3d 48, 55 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) (op. on reh'g); *see Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (stating that standard of review is same for both direct and circumstantial evidence). A "mere modicum" of evidence is not sufficient to rationally support a conviction beyond a reasonable doubt. *Baltimore*, 689 S.W.3d at 340 (quotation omitted). In reviewing the sufficiency of the evidence, courts consider "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Guevara*, 152 S.W.3d at 49 (quotations omitted).

When reviewing the legal sufficiency of the evidence to support a conviction, we consider all the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, the jury was rationally justified in finding guilt beyond a reasonable doubt. *Baltimore*, 689 S.W.3d at 341 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Williams*, 606 S.W.3d at 54. We consider all the evidence in the record, both admissible and inadmissible. *Williams*, 606 S.W.3d at 54.

The jury is the sole judge of the witnesses' credibility and the weight to be given their testimony, and the jury may accept or reject all or any part of a witness's

testimony. *Id.*; *accord Baltimore*, 689 S.W.3d at 342. The jury may also draw reasonable inferences from the trial evidence if each inference is supported by evidence. *Baltimore*, 689 S.W.3d at 342. Juries may not, however, reach conclusions based on mere speculation or factually unsupported inferences or presumptions. *Id.* We consider the cumulative force of all the evidence to determine whether the evidence was sufficient to establish each element of the offense. *Id.* at 341.

**B.      Governing Law**

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE § 19.02(b)(1). As relevant here, a person commits the offense of capital murder if he commits murder and murders more than one person during the same criminal transaction. *Id.* § 19.03(a)(7)(A). Under the multiple-murder theory of capital murder, the State must prove that the defendant had a discrete, specific intent to kill with regard to each death. *Ex parte Norris*, 390 S.W.3d 338, 340 (Tex. Crim. App. 2012) (quotation omitted); *Fields v. State*, 515 S.W.3d 47, 53 (Tex. App.—San Antonio 2016, no pet.).

**C.      Analysis**

Suljanovic contends that the State presented no evidence establishing his intent to kill his wife Adrianna, and therefore the evidence was legally insufficient

16

to support his conviction.[13] Specifically, he argues that no evidence showed what happened inside the bedroom when Omar and Adrianna were killed except his own testimony denying that he shot Adrianna and denying that he had specific intent to kill her. Suljanovic acknowledges Leasly's testimony that he told her he "shot" or "killed those bastards" after exiting the bedroom, but he contends that this testimony was impeached.

The State responds that the jury did not believe Suljanovic's testimony and that other circumstantial evidence showed his intent to kill Adrianna. Specifically, the State argues that Suljanovic had threatened to kill Adrianna because she was having an extramarital affair, and he told Leasly that he had shot or killed those "bastards" immediately after Omar and Adrianna were killed. The State also argues that Omar and Adrianna were shot in similar locations in the head, Suljanovic attempted to conceal evidence, and he made false statements to police.

Suljanovic correctly argues that his trial testimony was the primary direct evidence of the events that occurred inside the bedroom when Adrianna and Omar were killed. At trial, Suljanovic denied shooting or killing Adrianna or having any intent to do so. He testified that when he returned home immediately before she was killed, he carried his firearm in a waist holster. He went into his bedroom but did not

---

[13]     Suljanovic does not contest that sufficient evidence exists that he specific intent to kill Omar.

17

see Adrianna. So he went into the adjoining bathroom where he encountered Omar. As Omar approached him, Suljanovic pulled his firearm out of the holster. Omar attacked him, he dropped the firearm, and Omar grabbed it. Omar fired three rounds into the floor, and Suljanovic pushed him. Omar fell into the closet, but he jumped up and advanced on Suljanovic. Suljanovic grabbed the firearm and fired a warning shot, which did not deter Omar's advance, so he fired a second warning shot which hit Omar in the leg. When Omar continued to advance despite the leg wound, Suljanovic shot him in the chest or stomach area. Omar fell to the ground, and Suljanovic went to look for Adrianna. He found her dead in the bedroom closet with a gunshot wound to her head. He then turned around and shot Omar several times as he lay on the ground. Suljanovic testified that Omar had accidentally shot Adrianna when he fired the three rounds into the ground, and Suljanovic denied that he had shot her. He also denied telling Leasly after the incident that he had "shot" or "killed those bastards."

The jury was the sole judge of Suljanovic's credibility, and it was not required to believe any of his testimony. *See Williams*, 606 S.W.3d at 54. The jury reasonably could have disbelieved this testimony because Suljanovic repeatedly testified at trial that he had lied to police during his custodial interrogations. Moreover, some of his testimony was contradicted by other witnesses. For example, law enforcement

18

officers testified that they did not find evidence indicating that any bullets had been fired into the ground.

Moreover, Leasly testified that she was awakened by three "rapid fire" gunshots in the bedroom. Suljanovic attempted to impeach this testimony with Leasly's prior statements to police.[14] However, the jury was the sole judge of Leasly's credibility at trial, and it reasonably could have accepted her testimony that she heard only three gunshots in rapid succession. *See id.* Additionally, other evidence corroborated Leasly's testimony and contradicted Suljanovic's testimony. For example, Dr. Listi testified that she found evidence of only three gunshot wounds during her postmortem examination of the bodies, which corroborated Leasly's testimony about the number of gunshots she heard.

Furthermore, the State argued during closing arguments that contrary to Suljanovic's version of the events inside the bedroom, the evidence indicated that when Suljanovic returned home, Omar and Adrianna were sleeping on the closet floor outside the view of the video camera Suljanovic had installed in the bedroom. Suljanovic found them asleep on the closet floor and shot them as they slept. This theory of Omar's and Adrianna's deaths is most consistent with Leasly's and Dr. Listi's testimony.

---

[14] Defense counsel asked Leasly if she remembered telling police that the shots were spaced out over a minute-long period, but Leasly testified she did not remember saying that.

Although the direct evidence of Adrianna's death and Suljanovic's specific intent to kill her is minimal, this is not dispositive of the issue of Suljanovic's guilt for the murder of Adrianna. *See Guevara*, 152 S.W.3d at 49. Intent may be inferred from circumstantial evidence such as a defendant's acts, words, and conduct before, during, and after the commission of an offense. *Elizondo v. State*, 487 S.W.3d 185, 201 (Tex. Crim. App. 2016); *Guevara*, 152 S.W.3d at 49.

Suljanovic's actions, words, and conduct prior to Adrianna's death are circumstantial evidence that he intended to kill her. *See Guevara*, 152 S.W.3d at 49. In the hours before her early-morning death, Suljanovic was hauling a load in his tractor-trailer from Houston to Louisiana. While driving, he viewed a live stream feed from a video camera that he had recently placed inside his bedroom. He viewed the feed more than twenty times during the drive, and he testified that he believed Adrianna was cheating on him because he saw her walking around the bedroom naked while she should have been asleep. So he stopped his truck on the side of the highway, turned off the GPS tracking device in the truck, turned around, and drove several hours home.

This was not the first time Suljanovic knew or suspected that Adrianna was having an extramarital affair. Suljanovic had previously enlisted his older children to ask an intoxicated Adrianna questions about the number of men she had slept with while he recorded her answers. A month before her death, Suljanovic was at a bar

when a witness heard him repeatedly and loudly state that Adrianna was out with her boyfriend, he would kill them if he caught them, he could get rid of them, and they would never be found. When Jordy Jr. was allowed into the bar to take Suljanovic home, Suljanovic told Jordy Jr. that "he was going to kill [Jordy Jr.'s] fucking mom." This evidence that Suljanovic believed Adrianna was cheating on him establishes a motive to kill her. *See Nisbett v. State*, 552 S.W.3d 244, 265 (Tex. Crim. App. 2018) ("Marital difficulty can establish a motive for murder."). Motive "is a significant circumstance indicating guilt." *Id.*; *Hacker v. State*, 389 S.W.3d 860, 870 (Tex. Crim. App. 2013) ("[P]roof of motive might be the glue that holds the entire case together.") (quotation omitted).

In addition to Suljanovic's suspicions that Adrianna was having an affair, there was also evidence showing that Suljanovic had physically and verbally abused Adrianna. Leasly testified that the relationship between Suljanovic and Adrianna was "pretty horrible" and "pretty abusive," and Suljanovic acknowledges on appeal that his "marriage was not a happy one." Suljanovic's physical and verbal abuse of Adrianna is circumstantial evidence that he was willing and capable of causing her harm. *See Guevara*, 152 S.W.3d at 49.

Opportunity is also a circumstance indicating guilt. *Nisbett*, 552 S.W.3d at 265; *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). The trial evidence established that Suljanovic had an opportunity to kill Adrianna. The

21

murders occurred around 6 a.m. Suljanovic testified that when he returned home immediately before Adrianna's death, Leasly was awake playing games on her phone. But Leasly disputed this testimony. She testified that she was asleep on the couch in the living room and that her siblings were asleep in their bedrooms when Suljanovic returned home. Detective May confirmed Leasly's version of events based on a search of her cell phone that showed no outgoing activity from midnight until after Adrianna's death. The jury was the sole judge of the witnesses' credibility, and it reasonably could have believed Leasly and May over Suljanovic. *See Williams*, 606 S.W.3d at 54. With everyone asleep in the house, Suljanovic had an unimpeded opportunity to kill Adrianna and Omar.

Suljanovic's actions, words, and conduct after Adrianna's death also provide overwhelming circumstantial evidence of his specific intent to murder Adrianna. *See Guevara*, 152 S.W.3d at 49. Leasly testified that when Suljanovic exited the bedroom after Adrianna's and Omar's deaths, he told her that he had "shot" or "killed those bastards." Leasly wanted to call 911, but Suljanovic told her not to because "there was no saving her, he shot her in the head." Suljanovic denied that he made these statements to Leasly. He contended that he had said he shot or killed the "bastard"—singular, not plural—referring only to Omar. Nevertheless, as the sole judge of the witnesses' credibility, the jury reasonably could have believed Leasly and disbelieved Suljanovic. *See Williams*, 606 S.W.3d at 54. Both statements

22

that Leasly recounted directly contradict Suljanovic's testimony that Omar accidentally shot Adrianna and that Suljanovic did not intend to kill her.

Moreover, Suljanovic took numerous steps to conceal the evidence of Omar's and Adrianna's killings. *See Guevara*, 152 S.W.3d at 50 (stating that attempts to conceal incriminating evidence is probative of wrongful conduct and is circumstance indicating guilt). For example, Suljanovic enlisted Jordy Jr. to remove Adrianna's and Omar's bodies from the closet, place them in the trunk of Leasly's car, and drive them to Louisiana. On the way to deliver the now-late load, Suljanovic turned on the truck's GPS near the location in Louisiana where he had previously turned it off. After delivering the load, Suljanovic left his three daughters in his tractor-trailer at a truck stop for nearly eighteen hours while he and Jordy Jr. drove the bodies across the border to Texas and back to Louisiana before dumping Omar's body in some trees along a rural road.

Suljanovic also testified that after he and his children returned home from Louisiana, he cleaned the trunk of the car where the bodies had been located. He also removed the carpet in the closet where Adrianna (and likely Omar) had been killed, and he cleaned up the blood in the closet. Law enforcement officers later found bleach in the bedroom that could have been used to clean the blood. The evidence also indicated that the drywall had been recently patched, possibly to repair damage caused by bullets.

23

Suljanovic also filed a missing person report for Adrianna after he returned from Louisiana. He acknowledged at trial that he had lied when filing this report. *See id.* (stating that inconsistent statements and implausible explanations to police are probative of wrongful conduct and are circumstances indicating guilt). After Detective Claburn requested a meeting with Suljanovic to discuss the missing person reports, Suljanovic agreed to meet with her, failed to show up to the meeting, and then fled to Mexico with all his children except Leasly. *See Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994) ("Evidence of flight or escape is admissible as a circumstance from which an inference of guilt may be drawn."). Before going to Mexico, Suljanovic obtained passports for his youngest daughters on an expedited basis. He drove the children to the Mexico City airport, where he bought airplane tickets to Eastern Europe. Then he boarded the plane and made it to London before he was arrested. *See id.*

In sum, there was significant circumstantial evidence of Suljanovic's specific intent to kill Adrianna and his guilt for the offense. Suljanovic's words, conduct, and actions before, during, and after her killing showed that he had a motive and opportunity to kill Adrianna. *Elizondo*, 487 S.W.3d at 201; *Guevara*, 152 S.W.3d at 49. We therefore hold that the evidence was legally sufficient to support the jury's findings that Suljanovic had specific intent to kill Adrianna and that he was guilty of the offense of capital murder.

We overrule Suljanovic's first issue.

## Denial of Mistrial

In his fourth issue, Suljanovic argues that the trial court erred by denying his motion for mistrial after the prosecutor made an improper sidebar remark while cross-examining him.[15]

### A.    Standard of Review and Governing Law

A mistrial is the remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (quotation omitted). Ordinarily, a prompt instruction to disregard will cure error associated with an improper question and answer. *Sandoval v. State*, 665 S.W.3d 496, 529 (Tex. Crim. App. 2022). A mistrial is required only when an impropriety was "clearly prejudicial to the defendant" and was "of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Perez v. State*, 695 S.W.3d 843, 851 (Tex. App.—Houston [1st Dist.] 2024, pet. ref'd) (quotation omitted).

We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Becerra v. State*, 685 S.W.3d 120, 127 (Tex. Crim. App. 2024); *Perez*, 695 S.W.3d at 851. Under this standard, we do not substitute our judgment for that

---

[15]    Suljanovic's remaining issues concern evidentiary rulings and cumulative error. We therefore consider his fourth issue out of order.

25

of the trial court; rather, we ask whether the trial court's decision was arbitrary or unreasonable. *Becerra*, 685 S.W.3d at 127. A trial court abuses its discretion when no reasonable view of the record could support the challenged ruling. *Id.*; *McDonnell v. State*, 674 S.W.3d 694, 699 (Tex. App.—Houston [1st Dist.] 2023, no pet.). We will uphold the trial court's ruling if it was within the zone of reasonable disagreement. *McDonnell*, 674 S.W.3d at 699 (quoting *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007)). In determining whether a trial court abused its discretion by denying a motion for mistrial, we balance three factors: (1) the severity of the misconduct (including its prejudicial effect); (2) the effectiveness of any curative measures taken; and (3) the certainty of the conviction or punishment assessed absent the misconduct. *Id.*

**B. Analysis**

During cross-examination, the State questioned Suljanovic about taking his children to Louisiana to dispose of Omar's and Adrianna's bodies in the following exchange:

| State: | Okay. You didn't want to leave your children behind while you did the load? |
|---|---|
| Suljanovic: | They want[ed] to come. |
| State: | They voluntarily wanted to come with you? |
| Suljanovic: | Leasly, Jordy [Jr.], yes, they want[ed] to come. The little ones, no. But I put them in the cab with me. |

26

| | |
|---|---|
| State: | So Jordy [Jr.] and Leasly wanted to get involved in the commission of a crime by driving bodies across [a] state line? They agreed to that? |
| Suljanovic: | Yes. |
| State: | And you're father of the year; said, That sounds like a great idea. |
| Defense Counsel: | I object to the father-of-the-year comment. That's a sidebar remark. |
| Trial Court: | Sustained. Sustained. |
| Defense Counsel: | Instruction to disregard. |
| The Court: | Ladies and gentlemen of the jury, please disregard the last statement made by the State. |
| Defense Counsel: | Motion for mistrial. |
| Trial Court: | Denied |

Concerning the severity of the misconduct, Suljanovic argues that the State's father-of-the-year remark was "derisive[]" and "inflammatory," and it supported the State's theme of the case that "Suljanovic was not just a murderer, but a bad husband and a bad father." We agree with Suljanovic that the comment was derisive, although the record is less clear whether the comment was inflammatory. The record indicates that the State's remark was intended to impeach Suljanovic's testimony that he allowed Leasly and Jordy Jr. to commit crimes because they wanted to do so, even though their actions were against their best interests. As discussed below, however, we conclude that any prejudicial effect from the comment was cured.

27

Concerning the effectiveness of any curative measures taken, Suljanovic argues that the severity of the State's remark was not cured by the trial court's "cursory" instruction to disregard, which he argues had "little to no curative effect." To support this argument, Suljanovic contrasts the trial court's instruction to disregard in this case with an instruction that this Court previously determined was a "strong" instruction:

> Ladies and gentlemen, I sustained the objection to [the witness's] last statement. You are instructed to disregard anything that is said about [it]. It's not a part of this case and not anything for you to consider and you are instructed not to consider it.

*See Glauser v. State*, 66 S.W.3d 307, 321 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). We find no meaningful substantive distinction between the two instructions.

Although the instruction in *Glauser* contained more sentences than the one at issue here, the instruction in this case effectively conveyed the same material information: the jury must disregard the State's remark. Moreover, Suljanovic offers no analysis showing how the instruction here had little or no curative effect. An instruction to disregard ordinarily cures error associated with an improper question and answer, and we presume that the jury followed the trial court's instruction. *Sandoval*, 665 S.W.3d at 529; *Rankin v. State*, 617 S.W.3d 169, 187 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd). This is particularly true where, as here, the improper remark was isolated. *See Sandoval*, 665 S.W.3d at 529 ("An instruction to disregard is more likely to cure prejudice when the improper reference is isolated.");

28

*Shannon v. State*, 942 S.W.2d 591, 597–98 (Tex. Crim. App. 1996) (holding that prosecutor's improper remark calling defendant "a sociopath" was isolated and any error in denying mistrial was cured by prompt instruction to disregard). The appellate record does not support the argument that the instruction did not cure any harm resulting from the remark.

Concerning the certainty of conviction absent the misconduct, Suljanovic argues that his testimony was the only direct evidence of what happened in the bedroom when Omar and Adrianna were killed; most of the State's evidence concerned the nature of the relationship between Suljanovic and Adrianna and what happened to the bodies; and Suljanovic's testimony was of "critical importance." This argument ignores the circumstantial evidence discussed above. We find no support in the record for Suljanovic's contention that the State's remark caused a guilty verdict.

After balancing the factors, we cannot conclude that no reasonable view of the record could support a denial of the motion for mistrial. *See Becerra*, 685 S.W.3d at 127; *Perez*, 695 S.W.3d at 851; *McDonnell*, 674 S.W.3d at 699. The trial court's instruction to disregard cured any harm resulting from the State's remark, and the record does not support an argument that Suljanovic would have been acquitted absent the remark. *See Perez*, 695 S.W.3d at 851. We therefore hold that the trial court did not abuse its discretion by denying Suljanovic's motion for mistrial.

We overrule Suljanovic's fourth issue.

## Evidentiary Issues

In his second, third, fifth, and sixth issues, Suljanovic contends that the trial court abused its discretion by admitting various testimonial evidence.

### A.    Standard of Review

We review a trial court's evidentiary rulings for an abuse of discretion. *Hart v. State*, 688 S.W.3d 883, 891 (Tex. Crim. App. 2024); *Perez*, 695 S.W.3d at 850. We will not reverse the trial court's ruling unless there was a clear abuse of discretion that was so clearly wrong as to lie outside the zone of reasonable disagreement. *Hart*, 688 S.W.3d at 891; *Perez*, 695 S.W.3d at 850.

### B.    Witness Testimony About Another Person's Truthfulness

In his second issue, Suljanovic contends that the trial court erred by overruling his objection when the State questioned a law enforcement officer about whether Jordy Jr. lied during his interviews with police. Suljanovic argues that one witness may not opine on another witness's truthfulness. The State responds that the trial court did not err because Jordy Jr. was not a trial witness.

At trial, the State asked Detective May whether Jordy Jr. was "fully honest or was he lying" during his interviews with police. Defense counsel objected on the grounds of speculation, hearsay, and seeking an improper personal opinion. The trial court held a bench conference and admonished the State to "stay away from hearsay,

unless there's an exception." The court then directed the State to rephrase its question and stated that it would rule on any subsequent objections. When testimony resumed, the following exchange occurred:

| | |
|---|---|
| State: | At this point [when you spoke to Jordy Jr. after his return from London,] had you developed knowledge, facts, [some] sort of basis as you were doing the investigation? |
| Witness: | Yes. |
| State: | All right. Without going into what Jordy Junior specifically told you, were there things that Jordy Junior lied about? |
| Defense Counsel: | Objection; personal opinion, hearsay, and speculation. |
| Court: | State, can you be more specific as far as your question? |
| State: | Without getting into the hearsay, that's the— |
| Court: | Okay. All right. Overruled. Go ahead. You may answer the question. |
| Witness: | Yes, he lied. |

As Suljanovic points out, a witness may not opine on the truthfulness of another witness or a complainant. *E.g.*, *Strahan v. State*, 617 S.W.3d 198, 204–05 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd); *see* TEX. R. EVID. 608. The jury is the sole judge of the credibility of witnesses and the weight to give their testimony. *Williams*, 606 S.W.3d at 54. "Direct opinion testimony about the truthfulness of another witness, without prior impeachment, is inadmissible, as it does more than 'assist the trier of fact to understand the evidence or to determine a fact in issue.'"

31

*Strahan*, 617 S.W.3d at 204 (quoting *Lopez v. State*, 343 S.W.3d 137, 140–41 (Tex. Crim. App. 2011)). It "*decides* an issue *for* the jury." *Yount v. State*, 872 S.W.2d 706, 709 (Tex. Crim. App. 1993). The rule applies to expert testimony and lay witness testimony alike. *Strahan*, 617 S.W.3d at 204.

Jordy Jr. was not a complainant or a trial witness, and his prior statements were not introduced into evidence at trial. Thus, the prohibition on testimony about another witness's or a complainant's truthfulness does not apply to Jordy Jr. *See id.* Moreover, the jury was not required to assess his credibility in determining Suljanovic's guilt, and his statements were not evidence or a fact in issue at trial. *See Yount*, 872 S.W.2d at 709; *Strahan*, 617 S.W.3d at 204; *Williams*, 606 S.W.3d at 54. We therefore hold that the trial court did not abuse its discretion by overruling the objection to the State's question about Jordy Jr.'s truthfulness in his statements to the police. *See Hart*, 688 S.W.3d at 891; *Perez*, 695 S.W.3d at 850.

We overrule Suljanovic's second issue.

## C. Questions to Suljanovic About His Extramarital Affair

In his third issue, Suljanovic contends that the trial court erred by allowing the State to cross-examine him about his extramarital affair because the testimony was not relevant, and it constituted prohibited character-conformity evidence.

During cross-examination, the State asked Suljanovic whether he had "cheated on [his] wife before[.]" After he answered "No," defense counsel objected

32

on the grounds of relevance and improper character-conformity evidence. The trial court held a bench conference and overruled the objection. The State then asked Suljanovic about whether he had ever cheated on Adrianna with a "waitress." Suljanovic eventually conceded that he had had sexual relations with a "stripper" shortly after Jordy Jr. was born in 2001, but he testified that he and Adrianna were separated at the time.

### 1. Relevancy

Suljanovic argues that evidence of his extramarital affair was not relevant because it was neither material to nor probative of any fact issue. He argues that the State did not allege that his affair was a motive for killing Adrianna, and the affair occurred more than twenty years before trial. The State responds that this evidence was admissible under Code of Criminal Procedure article 38.36 because it showed the nature of the relationship between Suljanovic and Adrianna, particularly that their marriage was not good.

Relevant evidence is generally admissible unless barred by other laws or the Rules of Evidence, and irrelevant evidence is not admissible. TEX. R. EVID. 402. Evidence is relevant if (1) it has any tendency to make a fact more or less probable than it would be without the evidence; and (2) the fact is of consequence in determining the action. TEX. R. EVID. 401. Evidence is relevant if it is both material

and probative. *Henley v. State*, 493 S.W.3d 77, 83 (Tex. Crim. App. 2016). Code of

Criminal Procedure article 38.36(a) provides:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

TEX. CODE CRIM. PROC. art. 38.36(a).

We agree with the State that evidence of Suljanovic's extramarital affair was admissible under article 38.36. *See id.* The relationship between Suljanovic and Adrianna was central to the State's theory of the case and the offense itself. *See Garcia v. State*, 201 S.W.3d 695, 703 (Tex. Crim. App. 2006) ("[T]he relationship between the Appellant and the victim was itself a material issue."). Indeed, the State contended that the primary motive to kill Adrianna was that Suljanovic caught her cheating in their bedroom. Numerous witnesses testified about multiple aspects of their relationship, including Adrianna's extramarital affairs and Suljanovic's physical and verbal abuse of Adrianna. Moreover, as the State points out, evidence that Suljanovic had an extramarital affair is relevant to show that he did not value his relationship with Adrianna and that his response to her affair was "hypocritical and reflected a controlling attitude toward their marriage." This evidence supported the State's theory of the case that he would rather kill Adrianna than mend the relationship or divorce her.

"Evidence does not need to prove or disprove a particular fact by itself to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving a fact of consequence." *See Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). In this case, the evidence was both material and probative of the marital relationship, which is admissible under article 38.36(a). *See* TEX. CODE CRIM. PROC. art. 38.36(a); *Henley*, 493 S.W.3d at 83. The marital relationship in turn provided a "small nudge" toward proving or disproving that Suljanovic had a motive to murder Adrianna. *See Gonzalez*, 544 S.W.3d at 370; *see also Nisbett*, 552 S.W.3d at 265 (stating that motive can indicate guilt).

That Suljanovic's affair occurred twenty years before trial does not change this analysis. Suljanovic does not point to any authority establishing that a twenty-year-old affair is irrelevant in a prosecution for murder of a defendant's spouse. Article 38.36(a) does not limit the time period of admissible evidence. TEX. CODE CRIM. PROC. art. 38.36(a). To the contrary, it makes admissible "*all* relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased." *Id.* (emphasis added). We cannot conclude that the trial court abused its discretion by overruling the objection to the extent the evidence was too remote in time. We therefore conclude that Suljanovic's extramarital affair was admissible under article 38.36.

## 2. Character-conformity evidence

Suljanovic also argues that the testimony constituted prohibited character-conformity evidence because it was elicited to show that he was "a bad person." He further argues that the line of questioning was inflammatory because the State emphasized that he had an extramarital affair with a "stripper." The State responds that evidence of extraneous acts is admissible for any relevant purpose other than conformity with character, and when an inference of character conformity can be drawn from admissible extraneous-act evidence, the proper remedy is a limiting instruction—not exclusion—which Suljanovic did not request.

Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. TEX. R. EVID. 404(b)(1). Such evidence may be admissible for another purpose, however, such as proving motive, opportunity, intent, absence of mistake, or lack of accident. TEX. R. EVID. 404(b)(2). When a trial court admits evidence for a limited purpose and the defendant requests a limiting instruction, the court must instruct the jury to consider the evidence only for the permitted purpose and only if it finds beyond a reasonable doubt that the defendant committed the bad acts. TEX. R. EVID. 105(a); *Dukes v. State*, 486 S.W.3d 170, 181 (Tex. App.—Houston [1st Dist.] 2016, no pet.). If the defendant does not request a limiting instruction when the evidence is admitted, it is admitted for all purposes.

36

TEX. R. EVID. 105(b)(1); *Dukes*, 486 S.W.3d at 181; *accord Hammock v. State*, 46 S.W.3d 889, 894–95 (Tex. Crim. App. 2001).

As discussed above, evidence of Suljanovic's extramarital affair was relevant to the relationship between Suljanovic and Adrianna. *See* TEX. CODE CRIM. PROC. art. 38.36(a). We therefore disagree that the evidence was relevant only to show that he was a bad person. As the State points out, the proper remedy in this circumstance was for Suljanovic to request a limiting instruction, not to request exclusion of the evidence entirely. *See* TEX. R. EVID. 105(a); *Dukes*, 486 S.W.3d at 181. To the extent that this evidence established that Suljanovic killed Adrianna and Omar in conformity with his character for being a bad person, he was required to request a limiting instruction when the State sought admission of the testimony. Because he did not do so, the testimony was admissible for all purposes. *See* TEX. R. EVID. 105(b)(1); *Dukes*, 486 S.W.3d at 181.

Moreover, we disagree with Suljanovic that the State inflamed the jury by referring to his affair partner as a stripper. The prosecutor asked Suljanovic whether he had an affair with a "waitress," and Suljanovic volunteered that the partner was a "stripper." Thus, Suljanovic himself introduced the term "stripper" at trial, and the State then repeated the term. The record does not support the contention that the State's repetition of this term inflamed the jury. We therefore hold that the trial court did not abuse its discretion by overruling Suljanovic's objections to the State's

37

questions about his extramarital affair. *See Hart*, 688 S.W.3d at 891; *Perez*, 695 S.W.3d at 850.

We overrule Suljanovic's third issue.

## D. Evidence of Suljanovic's Physical and Verbal Abuse of Leasly

In his fifth issue, Suljanovic contends that the trial court erred by admitting testimony from two witnesses that he had physically and verbally abused Leasly because the testimony was inadmissible under Code of Criminal Procedure article 38.36 and Rules of Evidence 404(b) and 403. The State responds that Suljanovic did not preserve this issue for appellate review because he did not object on these grounds or object to testimony that he abused Leasly, and therefore his appellate complaints differ from his objections at trial.

Two witnesses testified that Suljanovic physically and verbally abused Leasly. Guillermo, Leasly's uncle, testified that Leasly called him in February 2018 "upset" and "crying," and she asked him to come to her house. The State then asked what Leasly was asking him to do, and defense counsel objected to hearsay. The trial court overruled the objection after finding that the question elicited an excited utterance, which is an exception to hearsay under Rule of Evidence 803. *See* TEX. R. EVID. 803(2). Guillermo testified that Leasly asked him to come to her house because Suljanovic "beat them up, beat Leasly and Adrianna," and they had called the police.

Leasly also testified that Suljanovic had physically and verbally abused her. She first testified that her parents' relationship was "pretty abusive." When the State asked whether she personally witnessed abuse, defense counsel objected based on a previously filed motion in limine concerning extraneous offenses. The trial court held a bench conference, during which the State argued that evidence of the nature of Adrianna and Suljanovic's relationship was admissible under article 38.36. The State denied that it sought to introduce the testimony under Rule 404(b), and the court overruled the objection. At defense counsel's request, the trial court gave the jury a limiting instruction concerning evidence of extraneous crimes, wrongs, or other bad acts.

Leasly then testified that when she was seventeen, her parents got into an argument and "were getting physical in their bedroom and [Jordy Jr.] had to intervene[.]" Suljanovic then "came toward [Leasly] and took his aggression out on [her] and he hit [her] on multiple parts of [her] body" before returning to the bedroom to continue the argument with Adrianna. Leasly "ran out of the house" and "called the police." She also testified that she called Guillermo, and he went to her house. Suljanovic verbally abused her by calling her "a whore," "a slut," and "a bitch" and by making her feel unimportant and unloved. Suljanovic did not object to any of Leasly's testimony concerning his physical or verbal abuse towards her.

To preserve a complaint for appellate review, the record must show that: (1) the complaint was timely made to the trial court with sufficient specificity to make the court aware of the complaint, unless the specific grounds were apparent from the context; and (2) the trial court ruled or refused to rule on the complaint. TEX. R. APP. P. 33.1(a); *see also Wood v. State*, 693 S.W.3d 308, 323 (Tex. Crim. App. 2024) ("Most complaints are forfeited by a failure to object; that is, they have to be preserved."). "The purpose for requiring a timely, specific objection is twofold: (1) it informs the judge of the basis of the objection and affords him an opportunity to rule on it[;] and (2) it affords opposing counsel an opportunity to respond to the complaint." *Null v. State*, 690 S.W.3d 305, 318 (Tex. Crim. App. 2024) (quotations omitted). Preservation of error is a systemic requirement. *Id.* (quotations omitted). Moreover, to preserve error, the complaint at trial must match the issue raised on appeal. *Wood*, 693 S.W.3d at 323; *Veal v. State*, 682 S.W.3d 577, 584 (Tex. App.—Houston [1st Dist.] 2023, pet. ref'd) ("Making an argument to the appellate court that was not raised to the trial court usurps the trial court's function[.]") (quotations omitted).

Suljanovic did not object to any of the State's questions or witness testimony about his physical and verbal abuse towards Leasly. *See* TEX. R. APP. P. 33.1(a)(1). Defense counsel did object on hearsay grounds when the State asked Guillermo what Leasly had told him during a telephone conversation in February 2018. Defense

40

counsel also objected when the State asked Leasly about her parents' "pretty abusive" relationship. However, neither of these objections match Suljanovic's complaint on appeal that the trial court erred under article 38.36 and Rules 404(b) and 403 by admitting testimony about the abuse towards Leasly. *See Wood*, 693 S.W.3d at 323. Accordingly, we hold that Suljanovic did not preserve this issue for appellate review.

We overrule Suljanovic's fifth issue.

**E.     Victim-Impact Evidence During the Guilt-Innocence Phase of Trial**

In his sixth issue, Suljanovic contends that the trial court erred by admitting Leasly's testimony concerning why she resigned from the Navy after her mother's death and concerning why she was in therapy. He argues that this testimony "was akin to victim-impact testimony, which is irrelevant at the guilt-innocence phase of a trial . . . ." The State argues that the testimony was admissible to rebut defense counsel's opening argument that Leasly was responsible for covering up her mother's death. According to the State, Leasly's reasons for resigning from the Navy and seeking therapy showed that "she was traumatized by her relationship with her father and the murders," which "made it less likely that she was the one calling the shots when it came to covering up her mother's death."

At trial, the State asked Leasly whether "any part of [her] time in the Navy [was] difficult for [her.]" Defense counsel objected on the ground of relevance. At a

bench conference, the State argued that the testimony was relevant to rebut the defensive theory that Leasly did not allow Suljanovic to call 911 after the murders. Defense counsel responded that Leasly would testify she experienced "a triggering mechanism and a thought back to the abuse and all the yelling from [Suljanovic]" and that she "had to get in counseling because of [Suljanovic's] abuse," and therefore such testimony was not relevant and constituted inadmissible character-conformity evidence. The trial court overruled the objections, but it limited the State to the two questions about the reasons Leasly left the Navy and sought counseling. When testimony resumed, Leasly testified that she resigned from the Navy because her superior officers spoke to her in a manner that "was triggering" and "reminded [her] of [her] dad." She also testified that she sought counseling, which "has helped a lot."

Victim-impact evidence in a homicide case is "evidence concerning the effect that the victim's death will have on others, particularly the victim's family members." *Love v. State*, 199 S.W.3d 447, 456 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (quoting *Mathis v. State*, 67 S.W.3d 918, 928 (Tex. Crim. App. 2002)); *accord Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007). Such evidence is irrelevant at the guilt-innocence phase of trial because it does not tend to make more or less probable the existence of any fact of consequence with respect to guilt or innocence. *Love*, 199 S.W.3d at 456–57; *see also* TEX. R. EVID. 401(a); *Miller-El v. State*, 782 S.W.2d 892, 895 (Tex. Crim. App. 1990).

42

Here, Leasly's challenged testimony did not relate to the effect that Adrianna's death had on Leasly. *See Love*, 199 S.W.3d at 456 (stating that victim-impact evidence concerns effect *victim's death* had on others). Rather, it related to the effect that Suljanovic's physical and verbal abuse had on Leasly. Prior to introducing this testimony, Leasly testified about Suljanovic's physical and verbal abuse of her and the relationship she had with Suljanovic. She then testified that she resigned from the Navy because her superior officers spoke to her in a "triggering" manner that "reminded [her] of [her] dad." Importantly, Leasly did not testify that she resigned from the Navy because of the effect her mother's murder had on her. *See id.* Defense counsel acknowledged this at the bench conference before the trial court by arguing that Leasly would testify about "a triggering mechanism and a thought back to the abuse and all the yelling from [Suljanovic]."

After testifying about resigning from the Navy, Leasly also testified that she sought therapy, which "helped a lot." In isolation, this statement is ambiguous about whether the counseling addressed the effect of her mother's murder, the effect of her father's physical and verbal abuse, or both. In its proper context, however, the testimony about seeking therapy occurred immediately after Leasly testified about Suljanovic's abuse towards her, his relationship with her, and her resignation from the Navy due the "triggering" effect of her superior officers' conduct which reminded her of Suljanovic. This context helps resolve the ambiguity and indicates

43

that her testimony about therapy concerned Suljanovic's conduct towards Leasly and their relationship rather than her mother's murder. *See id.* Again, defense counsel acknowledged this by arguing at the bench conference that Leasly's anticipated testimony was irrelevant because it concerned Leasly seeking "counseling because of [Suljanovic's] abuse."

We note that Suljanovic did not expressly object to Leasly's testimony on the ground that it would constitute impermissible victim-impact evidence. *See* TEX. R. APP. P. 33.1(a)(1). To some degree, this failure to object hinders the Court's ability to resolve this issue. *See Null*, 690 S.W.3d at 318 (stating that purpose of requiring specific objection is to inform trial court of basis for objection, afford opportunity for ruling, and allow opposing counsel opportunity to respond). Nevertheless, we conclude that the trial court reasonably could have determined that Leasly's testimony was relevant to whether Suljanovic physically and verbally abused Leasly, which in turn was relevant to rebut the defensive theory that Leasly—and not Suljanovic—was at least partially responsible for covering up Adrianna's murder. Accordingly, we hold that the trial court did not abuse its discretion by overruling the objection to the testimony. *See Hart*, 688 S.W.3d at 891; *Perez*, 695 S.W.3d at 850.

We overrule Suljanovic's sixth issue.

44

## Cumulative Error and Harm

In his seventh issue, Suljanovic argues that the cumulative error presented in his prior appellate issues resulted in cumulative harm.

Multiple errors may be harmful in their cumulative effect. *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009). However, the Court of Criminal Appeals has "never found that 'non-errors may in their cumulative effect cause error.'" *Id.* (quoting *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999)); *see also Jenkins v. State*, 493 S.W.3d 583, 613, 620 (Tex. Crim. App. 2016) (stating that where appellant failed to show error, "there is no error to cumulate").

We have already determined that the evidence was legally sufficient to support Suljanovic's conviction for capital murder and that the trial court did not err by denying the motion for mistrial and overruling the various evidentiary objections challenged on appeal. Therefore, because we find no error, we hold that there was no cumulative error or cumulative harm. *See Jenkins*, 493 S.W.3d at 613, 620; *Gamboa*, 296 S.W.3d at 585.

We overrule Suljanovic's seventh issue.

**Conclusion**

We affirm the trial court's judgment of conviction.

David Gunn
Justice

Panel consists of Chief Justice Adams and Justices Rivas-Molloy and Gunn.

Do not publish. TEX. R. APP. P. 47.2(b).